## FLORIDA EAST COAST RAILWAY COMPANY
### v.
### The UNITED STATES.
### No. 7-68.

United States Court of Claims.
Dec. 12, 1972.

——◆——

Kenneth G. Anderson and James D. O'Donnell, Miami, Fla., for plaintiff. Laurie W. Tomlinson, Miami, Fla., attorney of record. Culverhouse, Tomlinson, Mills, DeCarion & Anderson, Jacksonville, Fla., W. A. Gartner, Miami, Fla., and Dennis J. Lanahan, Jr., Jacksonville, Fla., of counsel.

Mark Segal, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 12, 1971. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by plaintiff. Defendant took no exception thereto except as noted in its reply to taxpayer's exception to finding 16 and otherwise requested that the court adopt the findings and recommended conclusions of law. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER

FLETCHER, Commissioner:

This case of first impression requires judicial interpretation of certain provisions of the 1954 Internal Revenue Code which are known by the popular name of the Railroad Retirement Tax Act. 26 U.S.C. §§ 3201–3233.

More specifically, the question presented to the court is whether certain payments or allowances "in lieu of vacation" paid by plaintiff in December 1963 to its "inactive" employees on strike relate back to the last month worked, i. e., January 1963, or whether those pay-

ments can only be "deemed earned" in the month of December 1963 when, for the first time during the year, it became clear that no actual vacation would be taken by any of the employees involved. The importance of determining the proper month arises out of a Congressional amendment to the statute whereby, as of October 31, 1963, the maximum monthly compensation base (upon which the 7¼ percent tax is measured) was increased from $400 to $450. As will appear below, the question involved is novel and difficult, but on the evidence presented, I have concluded that the proper month for reporting the payments is December 1963.

The detailed facts will be found in the Findings of Fact below. Here, they will be summarized only. Since 6:00 a. m. of January 23, 1963, the plaintiff, Florida East Coast Railway Company (FEC), has been struck by eleven so-called "non-operating" [1] labor organizations representing some of plaintiff's employees. During brief periods of time in 1963, members of various operating groups of employees represented by their respective labor organizations were also on legal strike against FEC, and even when such employees were not on legal strike, they would not cross any picket lines.

On February 3, 1963, FEC resumed operations by employing supervisory personnel and replacements for the strikers as well as for those operating employees who refused to cross picket lines. During 1963, and since, FEC has tried to settle the strike and resume normal operations but these efforts have been unsuccessful. The striking and non-working employees have not been fired or otherwise discharged by FEC, and have retained seniority with respect to their jobs.

The collective bargaining agreements between FEC and the various organiza-

tions representing its employees all contained vacation clauses. Essentially, these agreements provided for the calculation of days of vacation entitlement under a schedule giving effect to the number of days worked in the *preceding* year and to the number of years the individual employee had been in FEC's service. As of December 26, 1962, vacations for the calendar year 1963 had been scheduled for all groups of operating employees, such as locomotive engineers, firemen, conductors, and trainmen. As of the time of the strike, vacation schedules had not been established for the non-operating employees because under normal railway procedures, such vacation schedules were not prepared until the spring of the vacation year. Various employees were notified in 1963 that their scheduled vacations would have to be deferred pending resumption of normal operations. Under the collective bargaining agreements, where employees were not able to take their vacations, they became entitled to receive payments (sometimes also called "allowances") in lieu of the missed vacations. In December 1963, when it had become apparent that the strike would not be settled and that the inactive employees would not be able to take an actual vacation, FEC paid to its inactive employees $511,350.54. These payments were payments in lieu of vacations not afforded plaintiff's inactive employees during 1963.

Near the end of the year, some of FEC's inactive employees and their Union representatives complained to the United States Railroad Retirement Board that the payments in lieu of vacations made in December 1963 had not been reported by FEC as creditable compensation under the Railroad Retirement and Railroad Unemployment Insurance Acts. After considering these complaints, on January 21, 1964, the General Counsel of the Railroad Retirement

---

1. "Non-operating" employees are those whose duties do not involve *direct* operation of plaintiff's transportation equipment. Such employees are to be contrasted with the so-called "operating" employees such as locomotive engineers, firemen, conductors, and the like.

Board informed FEC that the payments in question should be allocated to December 1963 rather than to January 1963 as had been done by FEC. This ruling followed an earlier opinion of the General Counsel to the same effect in 1942. FEC disagreed with the General Counsel's opinion and asserted that the payments in question had already been earned in January 1963 so that they were subject to the maximum of $400 in computing railroad retirement taxes due. Under this theory, FEC determined that only $117,988.81 of the $511,350.54 payments were subject to tax.

On July 17, 1964, in response to the questions that had been raised within the railroad industry by the FEC dispute, the Railroad Retirement Board issued an industry-wide pronouncement of a statement of principles for reporting vacation pay and allowances in lieu of vacation and lump-sum termination allowances under the Railroad Retirement and Railroad Unemployment Insurance Acts. This "statement" repeated the opinion the Board had given the taxpayer in January. Regarding "Allowances to Employees for Vacations not Taken," specifically those employees who had not died or retired or had had their services terminated by resignation or discharge, the Board said:

1. *Allowance Paid Before December of Vacation Year*—
   Report as compensation for the period covered by the payroll on which the allowance is carried.
2. *Allowance Paid in December of Vacation Year or Thereafter*—
   Report as compensation for December of the vacation year.

Under date of May 26, 1967, the Internal Revenue Service assessed additional railroad retirement tax against the plaintiff of $55,238.52. The deficiency in tax was computed on the basis that all payments made in December 1963 ($511,350.54) were taxable in that month except for the portion thereof which in the case of any one employee exceeded $450 (a total of $12,406.40).

Total taxable compensation according to the computation was determined to be $498,944.14 ($511,350.54 less $12,406.40) and from that sum there was subtracted that portion of the payment ($117,988.-81) on which railroad retirement tax had already been paid, leaving a balance of $380,955.33 construed to be taxable wages subject to additional tax. The tax on this sum, at a rate of 7¼ percent, was $27,619.26. As both the employer's and employee's shares were the same, plaintiff, on June 16, 1967, paid to the District Director of Internal Revenue, Jacksonville, Florida, $55,238.52, plus interest of $10,913.74 to the date of payment.

Under date of June 27, 1967, plaintiff filed a claim for refund seeking $66,152.26, together with such other greater amount as might be legally refundable. No action was taken on that claim within six months from the date of its filing and thereafter, on January 10, 1968, the petition herein was filed. Plaintiff's refund claim was formally disallowed on March 25, 1968.

The combination of the Railroad Retirement Act of 1937 (45 U.S.C. §§ 228a–228y), the Railroad Unemployment Insurance Act (45 U.S.C. §§ 351–367), and the Railroad Retirement Tax Act (26 U.S.C. §§ 3201–3233) provides a "social security" system for railroad employees. The funding of benefits under the first-named Act is provided by an employment tax levied equally on the railroad employers and their employees in much the same way as that provided by the more familiar social security system funded by the Federal Insurance Contributions Act. 26 U.S.C. §§ 3101–3126. One salient difference between the two taxing systems has occasioned the dispute in this case. Whereas F.I.C.A. taxes are a stated percentage of an *annual* wage up to a stated maximum (26 U.S.C. § 3121(a)(1)), railroad retirement taxes are a stated percentage of a maximum *monthly* wage. 26 U.S.C. § 3201 et seq. As mentioned earlier, Congress increased the maximum monthly wage upon which railroad retirement

taxes were to be computed from $400 to $450 effective October 31, 1963. *See*, Sec. 201, Act of October 5, 1963, P.L. 88–133, 77 Stat. 219. The effective date of change is important because the payments involved were not actually made until December 1963 after the increase. However, the payments so made were in lieu of vacations earned by the striking employees for services rendered to FEC during 1962 before the increase, and FEC accordingly contends that the applicable maximum was $400.[2] The defendant, on the other hand, contends that the payments can not be deemed to have been earned until December 1963 when, the strike continuing, it became clear that no vacations would be taken so that allowances in lieu thereof then became payable.[3]

Counsel for both parties are in agreement that there is little if any, case precedent to guide the court in answering this difficult question of statutory interpretation. Nonetheless, it must be resolved "even though adjudication may involve severe birth pains." Paul, Dobson v. Commissioner, 57 Harv.L.Rev. 753, 777 (1944).

Obviously, the starting point must be an analysis of the pertinent statutory provisions and the regulations promulgated pursuant thereto. The Railroad Retirement Tax Act is incorporated into the Internal Revenue Code of 1954 commencing with section 3201 of that Code. 26 U.S.C. § 3201 et seq. That section imposes a tax on "compensation paid" to railroad employees, and the immediately following section requires employers to collect the tax by the familiar means of withholding it "from the compensation of the employee as and when paid." 26 U.S.C. §§ 3201–3202. An equivalent tax is imposed on employers by section 3221. The statutory term "compensation" is defined by section 3231(e) which reads, in pertinent part, as follows:

(1) The term "compensation" means any form of money remuneration earned by an individual for services rendered as an employee to one or more employers, * * * including remuneration paid for time lost as an employee, but remuneration paid for time lost shall be deemed earned in the month in which such time is lost. * * *

(2) A payment made by an employer to an individual through the employer's payroll shall be presumed, in the absence of evidence to the contrary, to be compensation for service rendered by such individual as an employee of the employer in the period with respect to which the payment is made. An employee shall be deemed to be paid "for time lost" the amount he is paid by an employer with respect to an identifiable period of absence from the active service of the employer, * * *.

The Treasury Regulations on Employment Taxes (1954 Code) also deal *inter alia* with the term "compensation," and when it shall be deemed to have been

---

2. FEC opts for either of two dates as the time when the payments should be deemed as earned: (1) January 1963 when the strike began and the employees ceased work, or (2) the end of 1962 when the amount of vacation entitlements under the employment agreements became known. Both dates, of course, precede the October 31, 1963 increase in the statutory maximum.

3. The tax effect flowing from those divergent views as to the proper date is obvious. What is not so obvious is a side effect on FEC's striking employees. As explained by defendant in its brief, under the Railroad Retirement Act, *supra*, the amount of a covered employee's annuity is determined by the number of months in which he earned or received compensation. The greater the number of months, the better from the employee's standpoint. Adoption of the defendant's date would mean that each employee who received an allowance in lieu of vacation in December 1963, and who had earned compensation in January 1963 became entitled to credit for two service months during 1963. Adoption of FEC's earlier date (January 1963), on the other hand, would result in a credit for only one month of 1963.

earned. Pertinent parts of Reg. § 31.-3231(e) are:

(2) The term "compensation" is not confined to amounts earned or paid for active service, but includes amounts earned or paid for an identifiable period during which the employee is absent from the active service of the employer * * *.

(b) *Items included as compensation.* The following items are included in compensation with respect to employees * * *:

\* \* \* \* \* \*

(2) Sick pay, vacation allowances, or back pay upon reinstatement after wrongful discharge.

\* \* \* \* \* \*

(c) *When compensation is earned.* Compensation is earned when an employee * * *. performs services for which he is paid or for which there is a present or future obligation to pay, regardless of the time at which payment is made or is to be made. Remuneration paid for any period of absence from active service shall be deemed to have been earned in the month in which such absence from service occurred. A payment made by an employer * * * to an individual through the payroll of the employer * * * shall be presumed, in the absence of evidence to the contrary, to be for services rendered by such individual in the period covered by the payroll and, thus, to have been earned in such period.

While it is clear from the foregoing excerpts that vacation pay "shall be deemed to have been earned in the month" in which the vacation is taken (Reg. § 31.3231(e)–1(c), *supra*), neither the statute nor regulations directly answer the question here involved, *viz.*, where *no* vacation is taken and a payment is made to the non-vacationing employee in lieu of vacation, when is that payment "deemed earned?"

In answering that question, defendant emphasizes the following provision of the statute contained in section 3231(e)(1), *supra*:

* * * remuneration paid for time lost shall be deemed earned in the month in which such time is lost.

In defendant's view, this can only mean that where a vacation is actually taken, the time lost must be the vacation period. However, where the vacation year expires without a vacation being taken, as here, the time lost is the last period when the vacation could have been taken. I find this to be a more logical and persuasive interpretation of the statute than that contended for by plaintiff. Therefore, the proper month for reporting payments made to railroad employees in lieu of an earned vacation is the last month of the vacation year. Not until then has the employee fulfilled the final condition for entitlement to such payment, namely, *not* taking his earned vacation.

Finally, it should be noted that this solution is in keeping with a longstanding administrative interpretation in the form of an opinion issued by the General Counsel of the Railroad Retirement Board. *See* finding 18, *infra*. It is a time-honored doctrine that in construing a statute, "the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect." Edwards's Lessee v. Darby, 25 U.S. (12 Wheat.) 206, 210, 6 L.Ed. 603 (1827). *See, also* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Houston v. United States, 297 F.2d 838, 842, 156 Ct.Cl. 38, 46, cert. denied, 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 56, reh. denied, 371 U.S. 906, 83 S.Ct. 204, 9 L.Ed. 167 (1962); and Chambers v. United States, 451 F.2d 1045, 1049, 196 Ct.Cl. 186, 192 (1971).

Accordingly, the petition should be dismissed.

## FINDINGS OF FACT

1. The plaintiff is the Florida East Coast Railway Company, a corporation

formed under the laws of the State of Florida with its principal place of business at Malaga and King Streets, St. Augustine, Florida.

2. This action is brought pursuant to the laws of the United States, particularly § 1491 of Title 28, United States Code, as amended, and the provisions of the 1954 Internal Revenue Code, against the United States of America for recovery of railroad retirement tax and interest assessed and collected from the plaintiff for the period of October 1, 1963 through December 31, 1963.

3. The plaintiff timely filed its railroad retirement tax return for the period ended December 31, 1963, with the District Director of Internal Revenue, Jacksonville, Florida. The tax shown to be due on that return in the amount of $152,029.28 had been previously paid through the media of depository receipts.

4. The depository receipt for the month of December 1963 was dated January 15, 1964, and reflected a deposit of $66,591.98. That deposit consisted of the employer's share of railroad retirement tax in the amount of $6,910.47 on vacation payments made to active employees and the amount of $8,551.83 on payments in lieu of vacation made to inactive employees. Railroad retirement tax, the employer's share, for regular wages for the month of December was in the amount of $17,833.69. The total of employer's share of railroad retirement tax reported for the month of December 1963, was in the amount of $33,295.99, which, when added to a like amount representing the employees' share, is equivalent to the aforesaid deposit for the month of December 1963, of $66,591.98. Hereinafter when describing the payments made to employees, the tax on which is here in issue, such payments will be referred to as "payments in lieu of vacation" for the purpose of identification and not definition.

5. Payments in lieu of vacation made to "inactive" employees in the month of December 1963 totaled $511,350.54, on which railroad retirement tax payments totaling $8,551.83 were withheld, matched by the plaintiff, and paid.

6. The tax on payments in lieu of vacation, as reported by the plaintiff, was in the amount of $17,103.66, representing the employer's contribution of $8,551.83 and a like amount for the employees, and was computed on the basis that the payments in lieu of vacation made to "inactive" employees were taxable in the last payroll period during which these employees worked, that being the month of January 1963. On this basis, only $117,988.81 of the total payments in lieu of vacation to "inactive" employees ($511,350.54) would be subject to railroad retirement tax.

7. Employees for whom maximum railroad retirement tax payments were made in 1962, that is, those employees on whose wages the plaintiff paid railroad retirement tax up to the maximum of tax on $4,800.00 in wages during the year 1962, received payments in lieu of vacation in the amount of $233,331.15. All other employees received payments in lieu of vacation totaling $278,019.39, of which $190,798.43 would be subject to the railroad retirement tax if it is determined that the plaintiff is not liable for the tax on more than $4,800 of compensation of each such employee for services performed in 1962 and that the payments in lieu of vacation are additional compensation for 1962. In the event the aforementioned determination is made, the plaintiff is liable for the tax on $190,798.43 of the payments in lieu of vacation less the tax paid on those payments of $8,551.83.

8. Under date of May 26, 1967, the District Director of Internal Revenue assessed additional railroad retirement tax alleged to be due by the plaintiff in the amount of $55,238.52. The tax was computed on the basis that all payments made in lieu of vacation to inactive employees in the month of December 1963, equaling $511,350.54 were taxable in that month except for the portion of

such payments which in the case of any given employee exceeded $450, such excess in total computed to be the amount of $12,406.40. Total taxable compensation as per the computation of the District Director was determined to be $498,944.14 ($511,350.54 less $12,406.-40). From this amount there was subtracted that portion of the payments in lieu of vacation on which railroad retirement tax had already been paid, that being the amount of $117,988.81. The balance of $380,955.33 was construed to be taxable wages and, accordingly, a tax in the amount of $27,619.26, representing the employer's share at the rate of 7¼ percent, and a like amount representing the employees' share at the same rate was alleged to be due. The total of the employers' and employees' shares, accordingly, equals the $55,238.52 in railroad retirement tax assessed.

9. Stated in summary fashion, the above paragraphs reflect the following:

*Deposit of Railroad Retirement Tax on January 15, 1964:*

| | |
|---|---|
| (a) Tax on "payment in lieu of vacation" paid to inactive employees | $8,551.83 |
| (b) Tax on vacation payments made to active employees | 6,910.47 |
| (c) Tax on regular wages | 17,833.69 |
| Total Employer's share | 33,285.99 |
| Employees' share | 33,285.99 |
| Total Deposit January 15, 1964 | 66,591.98 |
| Total "Payments in lieu of Vacation" | $511,350.54 |
| Less: Amount on which tax of $8,551.83 was paid and deposited in January 1964 | 117,988.81 |
| Total | 393,361.73 |
| Less: Defendant's determination of December payments to any one employee in excess of $450 | 12,406.40 |
| Amount on which tax is in dispute | 380,955.33 |
| Tax in dispute: | |
| Employer's share (7¼%) | 27,619.26 |
| Employees' share (7¼%) | 27,619.26 |
| Total | 55,238.52 |

[A7092]

10. Under date of June 16, 1967, plaintiff paid to the District Director of Internal Revenue, Jacksonville, Florida, the amount of the additional assessment, $55,238.52 plus interest of $10,913.74 to the date of payment.

11. Under date of June 27, 1967, plaintiff filed Form 843, Claim for Refund, for the quarter ending December 31, 1963. No action was taken on the aforesaid claim within six months from the date of its filing and thereafter on January 10, 1968 a petition was filed with this court for a refund of the railroad retirement tax alleged to be due. A notice of disallowance of the claim for

refund was sent to the plaintiff by certified mail on March 25, 1968.

12. At 6 a. m., January 23, 1963, employees represented by eleven cooperating non-operating labor organizations called a strike against the Florida East Coast Railway Company, which strike is still in effect. As a result thereof, all traffic originating on and destined to points on the Florida East Coast Railway was embargoed and coincident with cessation of receipt of traffic, the plaintiff informed its employees that all positions falling within the scope of designated craft working agreements were abolished.

13. Between the periods 12:01 a. m., April 5, 1963, to 12:01 a. m., May 7, 1963 and 12:01 a. m., July 10, 1963, to August 30, 1963, members of the operating groups of employees represented by the Brotherhood of Railroad Trainmen, Order of Railway Conductors and Brakemen, Brotherhood of Locomotive Engineers, and the Brotherhood of Locomotive Firemen and Enginemen were also on legal strike against the Railway.

14. In addition, during the period of time the operating groups of employees were not on legal strike, they did not cross any picket lines. Thus, no employees to whom were paid the "payments in lieu of vacation" at issue in this case (inactive employees) have worked after 6 a. m., January 23, 1963.

15. As of December 26, 1962, vacation schedules had been set up for all yardmen, locomotive engineers, firemen, conductors, and trainmen (all groups of operating employees). No such schedules had been set up for non-operating employees in that, under normal operating railroad procedures, such schedules would not have been prepared until the spring of the vacation year 1963. During 1963, various operating employees were notified that their scheduled vacations would have to be deferred pending resumption of normal operations.

16. Due partly to a lack of competent bookkeeping personnel and other clerical problems arising from the work stoppage, plaintiff's payments of 1963 vacation pay, which were earned by its employees in 1962, were not made until December 10, 1963. In addition, withholding of such payments until nearly the end of 1963 reflected the interpretation by plaintiff's management of its contractual obligations under the applicable collective bargaining agreements as well as its hope that the strike might be settled before that time.

17. Under the applicable union contracts, the payments made in December 1963 to inactive employees were due and payable to all such employees who had worked for plaintiff during a specific time in 1962, with the exception of train porters, red caps, and conductors. The relevant and typical portion of the various contracts indicating this liability is as follows:

*Section 2(b)(2).—When vacations are not afforded*

If a vacation is not afforded, payment in lieu thereof will be made not later than the first payroll period in January of the following year, computed on the following basis:

(i) A yardmaster having a regular assignment will be paid in lieu of vacation the daily compensation (excluding casual or unassigned overtime) of such assignment for the number of vacation days to which entitled under Section 1.

(ii) A yardmaster not having a regular assignment will be paid in lieu of vacation on basis of the average straight-time compensation earned as a yardmaster in the last payroll period during which he performed service preceding the close of the vacation year for the number of vacation days to which entitled under Section 1.

\* \* \* \* \* \*

*Section 2(e)*

The vacation provided for in this agreement shall be considered to have been earned when the yardmaster has qualified under Section 1 hereof. If his employment status is terminated

for any reason whatsoever including but not limited to retirement, resignation, discharge, noncompliance with a union-shop agreement, or failure to return after furlough he shall at the time of such termination be granted full vacation pay earned up to the time he leaves the service including pay for vacation earned in the preceding year or years and not yet granted, and the vacation for the succeeding year if the yardmaster has qualified therefor under Section 1. If a yardmaster thus entitled to vacation or vacation pay shall die the vacation pay earned and not received shall be paid to such beneficiary as may have been designated, or in the absence of such designation, the surviving spouse or children or his estate, in that order of preference.

18. On November 2, 1942, the General Counsel of the United States Railroad Retirement Board issued his opinion L–42–601 in answer to various questions that had been raised with respect to the manner of handling vacations with pay and payments in lieu of vacations under the then standard vacation agreement of December 17, 1941, which had been entered into between various railroads and labor organizations. This opinion stated how the various payments were to be made for the purposes of crediting them under the applicable statutes and states in relevant part as follows:

Insofar as relevant, the vacation agreement of December 17, 1941, entered into between various railroads and labor organizations pursuant to the recommendations of the President's Emergency Board, provides that, beginning with the year 1942, an annual vacation with pay, varying in the case of certain employees with the number of years of continuous service, will be granted to each employee who has rendered compensated service of not less than 160 days during the preceding year; that the allowance for each day for which an employee is entitled to a vacation will generally be on the basis of his daily earnings;

that such vacation may be taken from January 1 to December 31 of the vacation year, with due regard, consistent with requirements of service, to be given to the desire and preference of the employee when fixing the vacation date; that, while it is intended that the vacation period will be continuous, the vacation may, at the request of the employee, be given in installments; that if a carrier cannot release an employee for vacation during the year, such employee is to be paid an allowance in lieu of the vacation; that no vacation with pay or payment in lieu thereof will be due an employee whose employment relation with a carrier has terminated prior to the taking of his vacation, except that an employee retiring under the provisions of the Railroad Retirement Act shall receive payment for vacation due; and that vacations shall not be accumulated or carried over from one vacation year to another.

Ordinarily remuneration for service is "earned" or becomes "payable" upon the rendition of service because the rendition of service is the only substantive condition necessary for payment. [Footnote omitted] However, in the case of vacation pay and payment in lieu of vacation, the rendition of service in the preceding calendar year, although a necessary prerequisite, is not the only substantive condition which must be met before the payment may be considered to have become "earned" or "payable." In the case of vacation pay, in addition to the requirement of at least 160 days' compensated service in the preceding year, there are the further conditions that the employee's employment relation with the employer has not terminated and that the vacation is actually taken. See General Counsel's Opinion on *Creditability as Compensation of Amounts Paid by Employer Upon Death of Employee,* Opinion No. 1938 R.R. 144, approved by the Board October 11, 1938. Consequently, if an employee takes his vacation in accord-

ance with the agreement, the payment for the period of such vacation does not become "earned" or "payable" until the vacation is actually taken and constitutes compensation for the period of vacation so taken, irrespective of when payment is actually made. In the case of payment in lieu of vacation, the same conditions must be met, except that instead of the requirement that the employee take his vacation there is the requirement that the employee do (sic) not take such vacation. Cf. General Counsel's Opinions on *Creditability of Compensation of Amounts Paid by Employer Upon Death of Employee, supra;* and *Lump sum Separation Allowances as "Compensation,"* Opinion No. 1941 U.I. 10. Since under the agreement a vacation may be taken at any time during the vacation year, from January 1 to December 31, that requirement is not met until the last day of the vacation year. Therefore, if an employee does not take his vacation but is to receive payment in lieu thereof, such payment becomes "earned" or "payable" on the last day of the vacation year, and is "compensation" for that day. An informal investigation of a number of railroads, parties to the agreement, shows that, as a matter of practice, if an employee cannot be released for a vacation, the allowance in lieu thereof will be paid to him at the end of the vacation year. The result will be the same even if the payment in lieu of vacation is made in the year following the vacation year, since by the last day of the vacation year the employee has met all the conditions necessary for such payment—he has performed the required amount of compensated service in the year prior to the vacation year, his employment relation has not terminated prior to the taking of his vacation in the vacation year, and he has not taken his vacation during such year. If, however, an employee is paid an allowance in lieu of vacation prior to the end of the vacation year, such allowance will have become "earned" or "payable" on the last day of the pay period with respect to which the payment is made and will constitute "compensation" for such day.

\* \* \* \* \* \*

Applying the principles set forth above, vacations with pay and payments in lieu of vacations under the vacation agreement of December 17, 1941, are to be handled as follows:

1. If an employee takes his vacation, the vacation payment should be reported for the period of such vacation.

\* \* \* \* \* \*

2. If any employee does not take his vacation but receives a payment in lieu thereof in December of the vacation year or thereafter, such payment should be reported as compensation for December of the vacation year.

19. Since the issuance of the aforesaid opinion in 1942, vacation plans under collective bargaining agreements for many crafts have been modified to eliminate the condition that the employee be in the employment of the company at the time of taking his vacation in order to be entitled to it. The modified agreements provide that irrespective of termination of employment, vacation pay previously earned is to be paid.

20. In December 1963, and thereafter, the United States Railroad Retirement Board, through its operating bureaus, received letters from railroad employees and their union representatives in which the writers complained that they did not think the payments received from plaintiff in December 1963 had been reported by the plaintiff as creditable compensation under the Railroad Retirement and Railroad Unemployment Insurance Acts.

After considering these complaints, on January 21, 1964, the General Counsel of the Railroad Retirement Board informed the plaintiff that the payments concerned were to be allocated to December 1963, and asked the plaintiff to take the steps necessary to reflect that allocation.

The plaintiff did not comply with the Board's request.

21. On July 17, 1964, in response to the questions that had been raised in the Florida East Coast dispute, the Railroad Retirement Board issued an industry-wide pronouncement of a statement of principles for reporting vacation pay and allowances in lieu of vacation and lump-sum termination allowances under the Railroad Retirement and Railroad Unemployment Insurance Acts. This "statement" repeated the opinion the Board had given the plaintiff in January 1964. The Board said, in part:

> (2) *Allowances to Employees for Vacations not Taken:*
>
>   \*   \*   \*   \*   \*   \*
>
> *(c) All Other Employees*
>
> 1. *Allowance Paid Before December of Vacation Year—*
>    Report as compensation for the period covered by the payroll on which the allowance is carried.
> 2. *Allowance Paid in December of Vacation Year or Thereafter—*
>    Report as compensation for December of the vacation year.

22. Plaintiff has never asserted before the Railroad Retirement Board that its striking or non-working employees had been fired or discharged; in fact, they were not fired, were not discharged, and retained full seniority (subject to conditions immaterial here) with respect to their jobs.

23. Virtually all of the plaintiff's striking or inactive employees received railroad unemployment insurance benefits from the Railroad Retirement Board; they were entitled to them either because they were on legal strike or out of work. An employee need not terminate his employment relationship with his employer to be entitled to unemployment benefits.

## ULTIMATE FINDINGS OF FACT

24. Although the right of plaintiff's inactive employees to their 1963 vacations was earned by them during the year 1962, under the circumstances, it was not until December 1963 that plaintiff could know the method by which it must discharge its vacation obligations to such employees.

25. By December 1963, it became apparent for the first time that plaintiff's striking employees would not take any scheduled vacations with pay and instead had become entitled to receive payments from plaintiff in the form of "allowances in lieu of vacation." Such allowances were thereupon paid by plaintiff during December 1963.

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.